UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


EVAN BRIAN HAAS,                )    CASE NO:  16-03175
                               )    ADVERSARY
              Plaintiff,       )
                               )    Houston, Texas
      vs.                      )
                               )    Monday, March 5, 2018
NAVIENT, INC, ET AL,           )
                               )    (3:28 p.m. to 4:20 p.m.)
              Defendants.      )


MOTION FOR SUMMARY JUDGMENT

BEFORE THE HONORABLE DAVID R. JONES,
UNITED STATES BANKRUPTCY JUDGE



Appearances:            See page 2

Court Reporter:         Recorded; FTR

Transcribed by:         Exceptional Reporting Services, Inc.
                        P.O. Box 18668
                        Corpus Christi, TX 78480-8668
                        361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**

Plaintiff:                    JASON W. BURGE, ESQ.
                              Fishman Haygood
                              201 St. Charles Ave., Suite 4600
                              New Orleans, LA 70170

                              MARC D. MYERS, ESQ.
                              Ross Banks May Cron & Cavin
                              7700 San Felipe, Suite 550
                              Houston, TX 77063

                              LYNN E. SWANSON, ESQ.
                              Jones Swanson Huddell & Garrison
                              601 Poydras St., Suite 2655
                              New Orleans, LA 70130

                              CATHY JOHNSON, ESQ.

                              ADAM CORRAL, ESQ.
                              Corral Tran Singh
                              1010 Lamar St., Suite 1160
                              Houston, TX 77002

Defendants:                   THOMAS M. FARRELL, ESQ.
                              KAREN ELIZABETH SIEG, ESQ.
                              McGuire Woods
                              600 Travis, Suite 7500
                              Houston, TX 77002

                      .

1          **Houston, Texas; Monday, March 5, 2018; 3:28 p.m.**

2                          **(Call to order)**

3          **(Hearing already in progress)**

4          THE COURT:  -- 3175, *Haas versus Navient*.

5          MR. FARRELL:  Judge, our adversaries were not right

6    out there in the hall.  You want to go see if I can find them?

7          THE COURT:  Yes, I greatly appreciate that.

8    Hopefully they won't be far.

9          **(Pause from 3:28 p.m. to 3:29 p.m.)**

10         MR. FARRELL:  Your Honor, they are not out there.

11   They -- I saw them get in the elevator when we took the last

12   break but I don't know which direction they went.

13         THE COURT:  Got it, thank you.  Best laid plans, I

14   suppose.

15         MR. FARRELL:  But I'm sure they'll be right here.

16         THE COURT:  Oh, they went to the library?  All right,

17   okay, got it.  Hopefully it won't be long.

18         **(Pause from 3:29 p.m. to 3:30 p.m.)**

19         MR. SPEAKER:  Thank you, your Honor.

20         THE COURT:  Certainly.  All right, --

21         MR. SPEAKER:  Sorry, your Honor (indisc.)

22         THE COURT:  I -- it -- you're not late, it's exactly

23   3:30.  So called the case.  If you'd just go ahead and make

24   your appearances, please.  Mr. Farrell, we'll start with you.

25              //

1          **MR. FARRELL:**  Your Honor, Tom Farrell, my partner,

2     Beth Sieg, is with me here for the Navient defendants.

3          **THE COURT:**  All right, thank you, good afternoon.

4          **MR. BURGE:**  Your Honor, Jason Burge here representing

5     interim class counsel in the punitive class.  We have Marc

6     Myers, Lynn Swanson, Cathy Johnson (phonetic), and Adam Corral.

7          **THE COURT:**  All right, thank you.  Good afternoon,

8     everyone.

9          **MS. SPEAKER:**  Good afternoon.

10         **THE COURT:**  All right, Mr. Farrell, your motion for

11    summary judgment.  And you can assume I've had opportunity to

12    read both the motion, think about it; I've read the response,

13    I've read the reply.  If it's in the pleadings, I think I got

14    it.  But if there's something you want me to know or you think

15    that I'm -- as I'm sure I will make comments along the way,

16    happy to revisit anything.  But I have read what's in the

17    papers.

18         **MR. FARRELL:**  I assumed as much, your Honor,

19    therefore I will not repeat what's in the papers.  I think the

20    first thing I did want to address though up front is sort of

21    why now, why are we raising this issue now in the form of a

22    summary judgment when we have class certification briefing

23    ongoing and --

24         **THE COURT:**  That's a cost issue, I get all of that.

25         **MR. FARRELL:**  Yeah, --

1    **THE COURT:**  I wasn't bothered by that.  What I was

2  bothered by more than anything was the statement that there was

3  still needed discovery and that there had been -- and, again, I

4  don't have a motion regarding this in front of me, but there

5  had -- the suggestion was made that there'd been resistance to

6  needed discovery.  And the question that I really want to ask -

7  - and I know you filed a reply that said, they got everything

8  they need, we're ready now.  Is there a genuine dispute that we

9  can have constructive, real, fully briefed, fully educated

10  argument on the motion for summary judgment, or is there a

11  genuine belief that there is something out there that is still

12  needed that would affect the outcome of this summary judgment?

13    **MR. FARRELL:**  Well, your Honor, from my perspective,

14  the answer is we're ready to go, we think it's ripe.  And I

15  would note that they did raise, you know, a 56(d) motion -- or

16  argument in their papers, but it's unaccompanied by any

17  affidavit that identifies --

18    **THE COURT:**  No, I got that.  And --

19    **MR. FARRELL:**  -- what additional discovery is

20  necessary.

21    **THE COURT:**  -- I'm aware of that issue which is why I

22  was trying to figure out if this was a placeholder, if you all

23  were working through something and there was an expectation

24  that something was coming, or if this is a real issue that I

25  need to be worried about.

1          **MR. FARRELL:**  From my perspective, it's a real issue.

2   We think that the discovery that's been going back --

3          **THE COURT:**  I'm sorry, you don't think it's a real

4   issue because you said you're ready to go, right?  I meant

5   whether or not there's any --

6          **MR. FARRELL:**  It's a ripe issue --

7          **THE COURT:**  A ripe issue.

8          **MR. FARRELL:**  -- that on which no further discovery

9   is going to shed any light.

10          **THE COURT:**  All right.

11          **MR. FARRELL:**  When they filed their reply -- their

12   response, we were in some back and forth meet-and-confer on

13   discovery.  That discovery really goes to the certification

14   issues.  Since then, we've produced a bunch more stuff.

15   They've made a trip to Navient, gotten in a clean room, and

16   looked at computer files.  We've had some depositions.  And all

17   of that, though, in our judgment goes to --

18          **THE COURT:**  Certification.

19          **MR. FARRELL:**  -- certification issues.  We think from

20   a factual standpoint on the two named Plaintiffs -- and I know

21   the Court has just --

22          **THE COURT:**  On the 3rd.

23          **MR. FARRELL:**  -- added leave to add --

24          **THE COURT:**  Right.

25          **MR. FARRELL:**  -- two more, but for the two that are

1  the focus of this motion, the only facts that are necessary are

2  their promissory notes, which set forth the purposes of their

3  loans, their schedules in bankruptcy which describe their

4  loans, their discharge orders, and their discovery responses

5  where they admit the purpose for which the loans were taken.

6          **THE COURT:**  Let me bring up an issue that you both

7  tend to do, but I want at least give you sort of my view of the

8  world.  You both treat a discharge order and the discharge

9  injunction as interchangeable.  And I will tell you both,

10  that's just not true.  And so I don't know if that changes your

11  arguments at all.  You know, in this district, we have a

12  standard form order that is a one-liner.  It says the debtor is

13  entitled to a discharge.  I mean, that's exactly what it says.

14  And it is I think signed -- always signed by a judge.  That may

15  not be the entirety of the case.  There are certain districts

16  around the country where discharge orders are actually signed

17  by the clerk.  And it -- 524 then says that a discharge then

18  triggers all of the following entitlements under 524.  And so I

19  just want both of you to know, because you both do it at

20  various times, that a discharge order and the discharge

21  injunction are not synonymous and they are not interchangeable.

22  And so I just -- it seems to me that that does affect the

23  argument.  But I want you to -- I want you both to know that's

24  a nuance that I have trouble getting over because when I see

25  you both do it, I go -- I stop and put a sticky on it that

1  says, this is just not right.  And so I -- again, you don't

2  need to respond to it, but I want you both to know that I do

3  see a very big difference.  I certainly think Judge Isgur sees

4  a very big difference.  And I think it drives the outcome in

5  his opinions.  I don't know that it drives the outcome in this

6  one.  But I just want you to know that I draw that very big

7  distinction in terms of the difference between a discharge

8  order and the statutory discharge injunction under 524.

9          **MR. FARRELL:**  I appreciate that, your Honor.  I think

10  to the extent that implicates or affects the argument at all,

11  it affects only the jurisdictional argument regarding --

12          **THE COURT:**  Agreed.

13          **MR. FARRELL:**  I don't think it affects the basic

14  statutory interpretation argument.

15          **THE COURT:**  I absolutely agree with you.

16          **MR. FARRELL:**  And frankly, Judge, what we're trying

17  to do here, I mean, it's no secret.  I mean, I'm going to stand

18  up here and tell you what I think the statute means.  Jason's

19  going to stand up and tell you what he thinks it means.  And

20  frankly what I think and what he thinks doesn't matter.  This

21  is an issue --

22          **THE COURT:**  Well, of course it does.

23          **MR. FARRELL:**  -- that needs to get resolved at a --

24  at the level of the higher court because, you know, bankruptcy

25  courts, as you've seen in the papers, are on different sides of

1    this across the country.

2             **THE COURT:**  Sure.

3             **MR. FARRELL:**  And, you know, our goal is to tee this

4    up in a way where we can get that issue decided once and for

5    all.  And given the agreed-order that we did after one of the

6    last hearings we were at where we stayed -- stopped collection

7    efforts, you know, there's no incremental harm or damage to be

8    -- being doing to anybody while we get this sorted out.  And so

9    our goal was to try and get it sorted out.

10             **THE COURT:**  Sure.  So let me ask you this.  And take

11   out of the equation -- and, I mean, I certainly want you to

12   make your record and I certainly want you to address all of the

13   issues that you think need to be addressed.  I'm not trying to

14   shortcut anything.  What I want -- I mean, in looking at the

15   arguments, the jurisdictional argument I just don't follow.  I

16   have been a big believer since the day that Judge Isgur issued

17   the *Cano* decision.  I think he got it right.  And it all comes

18   back to the difference between a discharge order and the

19   statutory discharge injunction.  I agree with the concept that

20   if I were to sign an injunction in a piece of litigation, I a

21   hundred percent agree with the suggestion that only I can

22   enforce that injunction and it should come back to me; because

23   as you rightfully point out, in issuing that injunction, you

24   know, only I know what was going on inside my head at the time

25   I issued it, what motivated me to grant that form of equitable

1  relief.  But the statutory discharge injunction, it is just a

2  much different creature.  It goes to the very core of the

3  bankruptcy process.  And so the jurisdictional argument I'm not

4  persuaded by.  And I -- again, I -- you know, I understand why

5  you make it.  I want you -- if you think you need to do

6  something more to preserve that issue, I want you to do it.

7          With respect to the statutory interpretation

8  question, let me ask you, are you contemplating seeking an

9  expedited or direct appeal of that issue, either one of you, if

10  you were to come out on the short end of that?  What is the --

11  if you don't mind me asking, what's the goal?  Because I want

12  to make sure I get this.  If you're going to try to do this on

13  -- you know, if you're going to try to stop, go get some

14  relief, and come back, I want to do everything I can do to

15  accommodate that review process.

16          **MR. FARRELL:**  With all candor, Judge, that is our

17  goal.  If you were to rule against us on the statutory

18  interpretation, we would in all likelihood ask the Court to

19  give a 1292(b), interlocutory appeal, defer the class

20  certification issues --

21          **THE COURT:**  Right.

22          **MR. FARRELL:**  -- until that is resolved.

23          **THE COURT:**  I got that issue.  In that case -- and I

24  appreciate you being candid.  And I want to expedite that

25  process for either one of you, because I assume that the

11

1  Plaintiffs would as well if you came up on the wrong end of

2  that.

3      **MR. BURGE:**  I would say I don't have any objection

4  or, you know, I suppose I hadn't given this a whole lot of

5  thought because Tom hadn't brought it up prior to us being here

6  today.

7      **THE COURT:**  Sure.

8      **MR. BURGE:**  I don't have any objection to getting the

9  issue in front of a higher court.  I think eventually it's

10  going to have to be in front of a higher court.  And I think in

11  terms of resolving this case would help us if we could get --

12  you know, if we weren't -- if we had a sense of what the

13  appellate court was going to do so we wouldn't --

14      **THE COURT:**  Right, so --

15      **MR. BURGE:**  So I would be nervous about staying the

16  case because I do think -- I don't -- not sure I agree with Tom

17  that the agreed-order has resolved all of the implications for

18  class members.  We've heard from class members, including our

19  class rep, that the -- you know, these loans still have an

20  effect on their credit even if Navient isn't actually

21  collecting them.  And so I think -- you know, I  hesitate to

22  agree to a complete stay and shut down class certification for

23  the Fifth Circuit to decide this case.  I mean, even if we do a

24  1292(b), they could always turn it down and then we've --

25      **THE COURT:**  Well, here's --

1       **MR. BURGE:** -- kicked the can who knows how far down

2 the road.

3       **THE COURT:** Right. Here's my view of the most

4 efficient way. I've thought a lot about this if you haven't

5 figured that out. I may be wrong about so many things but I've

6 thought about it a lot, is that if a party was going to appeal

7 the issue regarding the statutory interpretation question, it

8 would seem to me that I can immediately certify that for direct

9 appeal to the Fifth Circuit; because I agree quite honestly not

10 only in this case but this interpretation question comes up a

11 lot. And it would be nice to have something nice, succinct, on

12 the point, not driven by something else, but only on this

13 issue. And so my thought would be is that if I certified it

14 for a direct appeal, is that I would stay everything sufficient

15 to allow the losing party to go to the Fifth Circuit and seek a

16 stay. Obviously if the circuit stayed it, then the answer is -

17 - I mean, there isn't going to be any decision by me that would

18 change that. If the circuit refused the direct appeal, which

19 it certainly has the right to do, the I think that that would

20 dictate a different set of results. I also think that a

21 decision to deny motion to stay by the circuit would send a

22 message not to me as to the merits of what they thought but as

23 to what they expected to occur in the litigation. So that's

24 actually my thought. Because I agree with you, I don't want to

25 go through a long, drawn out, complicated certification hearing

1    if I turn out to be wrong on this issue.  Or I don't want the

2    certification to fall apart because I got it wrong from the

3    Plaintiffs' point of view.  I just -- to me, it just made

4    sense.  Any -- either one of you have a reaction to that?

5            **MR. FARRELL:**  That was our thought when we filed the

6    motion, Judge.  And, you know, we didn't put explicitly in

7    papers that was the plan, but I came here today planning to

8    tell you --

9            **THE COURT:**  Sure.

10           **MR. FARRELL:**  -- exactly what I told you.  So we

11   think that makes sense.

12           **THE COURT:**  All right.  So what -- you agree?

13           **MR. BURGE:**  And, I mean, my only concern is that I

14   think that, you know, deferring time does harm to this class.

15   But I -- you know, I think --

16           **THE COURT:**  How so?

17           **MR. BURGE:**  Well, only because our class members,

18   these debts, the ones that are at issue in this case, it is

19   true that they are no longer getting discharge violations --

20           **THE COURT:**  Right.

21           **MR. BURGE:**  -- from what the reports we're hearing.

22   But these debts are still on their credit reports, they're

23   still impacting their access to credit.  It's still causing

24   problems for them as they move forward because these debts have

25   not formally been recognized as discharged by Navient.  I agree

1   it is a less pressing damage than if they were getting called -

2   -

3         **THE COURT:**  But isn't that --

4         **MR. BURGE:**  -- two to eight times a day.

5         **THE COURT:**  -- something that could just be dealt

6   with ultimately in the damage model?

7         **MR. FARRELL:**  I think it could.  And, Judge, one

8   thing, you know, when we entered into the agreed order, we

9   agreed that we would stop collection efforts.  It was not part

10  of the agreement that we would stop the accrual of interest in

11  the time period.  But as a practical matter, we have.

12        **THE COURT:**  Right.

13        **MR. FARRELL:**  So interest is not accruing now at this

14  point.  So the only conceivable issue is the credit issue.  And

15  I think that does get addressed down the road.

16        **THE COURT:**  Yeah, I just think that that's a remedy.

17  I mean, it could turn out to be incredibly harsh if it turns

18  out that Navient was wrong.  And if Navient was right, then

19  there is no harm.  So I get all of that.  Then what I'd like to

20  do, Mr. Farrell, given that that's -- I want you to make

21  whatever jurisdictional argument that you feel like you need to

22  make.  But after having read everything, having done my own

23  research, I've told you where I'm going.

24        **MR. FARRELL:**  Right.

25        **THE COURT:**  And I -- you know, I'm happy to hear.

1  You know, you've changed my mind before and I certainly want

2  you to have the opportunity.  But I very much want, so that

3  there is a complete, accurate, full transcript -- because the

4  Circuit's going to get this.  And to the extent that a district

5  court is one step removed from bankruptcy proceedings, a

6  circuit court is multiple steps removed.  And so I want you to

7  make, even if it's repetitious, I want you to make your

8  statutory interpretation argument as complete as you would if

9  you thought that I'd never read anything.  And same for the

10 Plaintiffs.  Just so that there is a complete, robust argument

11 of the issue that again either one of you might seek to take

12 up.

13          **MR. FARRELL:**  Sure.

14          **THE COURT:**  All right?  All right.

15          **MR. FARRELL:**  In light of that, your Honor, I'm not

16 going to say much about jurisdiction then.  We obviously know

17 the *Cano* case is out there.  We respectfully disagree with it.

18          **THE COURT:**  Understood.

19          **MR. FARRELL:**  But all the bases we have for

20 disagreeing with it are in the papers and so I'm not -- there's

21 really nothing further to add on the jurisdictional piece.

22          On the statutory interpretation question, it's pretty

23 simple from our standpoint.  We believe 823 -- excuse me,

24 523(a)(8)(2), the educational benefit section, is plain on its

25 face.  And that the various cases that we've cited -- and, you

1    know, we can argue I suppose on who's counting the cases right

2    and whether our view is the majority view or the minority view.

3    I don't think that advances the ball any.  The cases are out

4    there.

5              THE COURT:  I agree.

6         MR. FARRELL:  They say what they say; although we do

7    have the majority.  But all kidding aside, we think those cases

8    get it right.

9              THE COURT:  Right.

10         MR. FARRELL:  And the statute on its face is plain.

11   And because it's plain and because it covers the kinds of debts

12   at issue here, there is no need to get to the legislative

13   history argument, there is no need to get to the canon of

14   construction argument.  The -- I can't even pronounce it but

15   you -- the canon that the Plaintiffs have relied on, you simply

16   don't get there and that --

17             THE COURT:  So let me ask you thinks because, you

18   know, bankruptcy lawyers tend to proceed along a very

19   predictable sequential path.  Is anytime we have a term, if you

20   will, and we're trying to figure out what it means, first thing

21   we do is we go to 101 and we look for in the definitions under

22   the Bankruptcy Code for a definition of that particular term.

23   And if we look under 101, I'm not aware of a definition of

24   "educational benefit."  And so is it -- and then having looked

25   at the legislative history -- and I get you say that I don't

1  have to, and I understand that argument.  But if I get to the

2  legislative history and the examples that it includes, doesn't

3  it suggest that your interpretation is wrong?

4          **MR. FARRELL:**  I don't think so, your Honor, --

5          **THE COURT:**  Okay.

6          **MR. FARRELL:**  -- because the legislative history

7  piece here, first of all, it relates to the 1990 amendment, not

8  to the 2005 amendment that we're talking about, --

9          **THE COURT:**  Okay.

10          **MR. FARRELL:**  -- number one.  Number two, it is a

11  comment from a United States Attorney, a non-legislator.  The

12  Supreme Court has --

13          **THE COURT:**  And my guess is a non-bankruptcy lawyer.

14          **MR. FARRELL:**  Well, I suspect that's right.

15          **THE COURT:**  Yeah.

16          **MR. FARRELL:**  And the Supreme Court has told us that

17  to the extent you're going to get into a legislative history at

18  all, comments from non-legislators are even less important.

19          **THE COURT:**  Certainly.  My point being, if we -- if

20  your argument is that this is so clear that the common,

21  everyday person would understand what it means, and here is --

22  if I take a U. S. Attorney as a common, everyday person not

23  schooled in bankruptcy, you know, according to you, he got it

24  way wrong.  And why isn't that sort of the quintessential

25  drawing the box around and saying if it's subject to reasonable

1  multiple interpretations, that it is ambiguous and I've got to

2  go figure it out?

3      **MR. FARRELL:**  Yeah, it's not so much that he got it

4  wrong, your Honor, but he was addressing a different issue.  He

5  was addressing the issue of whether an overpayment on a

6  conditional stipend or grant was covered by the existing

7  language or not.

8      **THE COURT:**  Okay.

9      **MR. FARRELL:**  He was addressing that point.  The

10  legislators then decided to put this in section -- into the

11  statute, which in our view has broader force and broader impact

12  than the issue that the U. S. Attorney was raising, which goes

13  to the fundamental point of what a -- you know, the fact that

14  that may have been his agenda when he was addressing the

15  congressional committee, you know, addressed his little point.

16      **THE COURT:  THE COURT:**  Fair enough.

17      **MR. FARRELL:**  It doesn't go to the broader force of

18  the statute.  And when you apply the broader force of the

19  statute in -- under the Plaintiffs' interpretation, an

20  obligation to repay funds doesn't include a loan.  I think if

21  we took ten people off the street and said, you've got a loan,

22  is that an obligation to repay funds, you're going to get ten

23  out of ten, you bet you.

24      **THE COURT:**  Right.

25      **MR. FARRELL:**  So that's our --

1          **THE COURT:**  No, I got that.

2          **MR. FARRELL:**  -- starting point.

3          **THE COURT:**  All right.

4          **MR. FARRELL:**  Our second point is, it's got to be an

5     obligation to repay funds received as an educational benefit.

6     We think that's established in the record.  Each of these

7     promissory notes recites that it is for educational purposes.

8     In fact, each of the promissory notes, the Plaintiff represents

9     that I'm only going to use the loan for that purpose, --

10         **THE COURT:**  Right.

11         **MR. FARRELL:**  -- and if I use it for some other

12    purpose, I'm going to give it back.

13         **THE COURT:**  And so let me ask you.  In your view of

14    the world, is you're telling me that "educational benefit," the

15    focus is on the fact that you're going to school, if you will,

16    and getting education versus a "if I have a job, I get a health

17    benefit and I could have an educational benefit."  I remember,

18    you know, when I -- my first job, you know, my employer would

19    pay 80 percent, you know, of my tuition for going back to

20    school.  And so in that case, "educational benefit" meant part

21    of my compensation package, not what I was receiving from the

22    institution.  Is that --

23         **MR. FARRELL:**  And --

24         **THE COURT:**  -- was that clear enough?

25         **MR. FARRELL:**  Yes, and --

1              **THE COURT:**  Okay.

2              **MR. FARRELL:**  -- we think the statute's broad enough

3    to cover both.

4              **THE COURT:**  You think it covers both, okay.  I did

5    not pick that up from your papers.  Got it, okay.

6              **MR. FARRELL:**  To the extent that -- I mean, obviously

7    there has to be in the case of the employer paying 80 percent

8    of your education, to the extent, you know, you then quit your

9    job and have to pay it back, that's when it gets picked up by

10   the statute.

11             **THE COURT:**  Right, okay.

12             **MR. FARRELL:**  Because in that sense, it's an

13   obligation to repay an educational benefit.  So we think the

14   statute's broad enough to cover both.  You know, and of course

15   the other side's going to say, well, we've proven too much

16   because if our reading of this subsection is correct, then it

17   subsumes all the other subsections and it renders all of the

18   rest of them superfluous.

19             **THE COURT:**  Right.

20             **MR. FARRELL:**  And, first of all, we don't think that

21   that's legally an appropriate analysis.  The Supreme Court, in

22   the *Huskey* case and other cases, have said, you know, that's

23   not the proper way to interpret the statute.  The legislature

24   often does a belt, suspenders, you know, catch all, has

25   multiple sections that sometimes overlap.  And overlapping

1    statutes, overlapping subsections doesn't --

2            **THE COURT:**  Isn't necessarily bad.

3            **MR. FARRELL:**  Isn't necessarily bad.  And, number

4    two, it's not entirely superfluous.  There are examples of

5    situations where one of these other subsections would pick up a

6    student loan, whereas (8)(A)(ii) that we're relying on would

7    not.  And the prime example of that, we've cited a case in our

8    papers, is the *Willis* case.  The *Willis* case, the grandfather

9    makes -- takes out a loan that is qualified under (b), which is

10    the section we're not relying on because it's a qualified

11    educational loan to a Title Four institution.

12            **THE COURT:**  Right.

13            **MR. FARRELL:**  Grandson quits school so grandfather

14    then has to pay it back.  Well, grandfather didn't get an

15    educational benefit --

16            **THE COURT:**  Right.

17            **MR. FARRELL:**  -- so it's not covered under (8)(A)(ii)

18    but it is covered under (8)(A)(B).  So there's not -- it's not

19    accurate that there is a complete overlap here in the sense

20    that our interpretation of (8)(A)(ii) would render the other

21    sections superfluous.

22            I do -- given the -- our comments at the beginning

23    about sort of making a record here that's as complete as

24    possible, --

25            **THE COURT:**  Sure.

1        **MR. FARRELL:**  -- I do want to talk about the factual

2   underpinnings for our case and make sure the record is clear on

3   what we were saying is sufficient summary judgment evidence

4   from our standpoint in order to tee up this question as cleanly

5   as possible.  And the first is the promissory notes themselves,

6   as I think I already mentioned.  In that regard, the reason

7   that's so significant and we say dispositive, we cite the

8   *Murphy* case, the Fifth Circuit case, which is in a slightly

9   different context.  But it establishes the notion that it is

10  the purpose of the loan, not its actual use, not things that

11  happened after the loan --

12          **THE COURT:**  Right.

13          **MR. FARRELL:**  -- that is dispositive for this

14  purpose.

15          **THE COURT:**  You can't go escape the liability by

16  doing something yourself, I got that.

17          **MR. FARRELL:**  Right, you can't enter into an

18  educational loan, then go spend it on drugs and drinking and

19  then say all of a sudden it's -- and that's in fact the exact

20  example the Fifth Circuit uses.

21          **THE COURT:**  Right.

22          **MR. FARRELL:**  So the key here is the purpose of the

23  loan.  And the purpose of the loan here in each case for

24  Mr. Shahbazi and for Mr. Haas is established by the loan

25  documents themselves.  And we've cited the exact provisions,

1   but they're very clear that this is for educational purposes,

2   if we use it for something other than educational purposes,

3   we're in essence not authorized to and any portion that's not

4   used for educational purposes we'll immediately repay.  So we

5   think the loan documents themselves establish that.  Then we --

6          **THE COURT:**  So if there is a recognition that, you

7   know, I'm borrowing -- I'm making this up.  I'm borrowing

8   $6,000 for the semester.  My tuition is $2,300.  And the

9   balance are for my books, for my rent, for food, for gas in my

10  car -- because a lot of those loans contemplate sort of the

11  package of being able to attend.  Is there a bifurcation that

12  occurs or is it all if -- once -- if it enables me to go to

13  school, it's covered as well under your theory?

14         **MR. FARRELL:**  Your Honor, under some of the loan

15  programs, that issue gets dealt with because cost of attendance

16  is a defined term under some of the Federal loan programs and

17  some of the qualified loan programs.  And so the school

18  actually certifies what the cost of attendance is.  And by its

19  definition, it sometimes includes or it often includes not just

20  tuition, room and board, but some of these --

21         **THE COURT:**  Other stuff, right.

22         **MR. FARRELL:**  -- miscellaneous additional things that

23  you're talking about.

24         **THE COURT:**  Right.

25         **MR. FARRELL:**  In the situation of an educational loan

1  covered by the statute where there is not a certification by

2  the school as to the cost of attendance, I'm going to kind of

3  glance over here at my colleague here to make sure I'm not

4  misstating something, but I think we take the position in that

5  position that the -- as long as part of the purpose is for

6  educational, then the entire loan is covered by the statute.

7      **THE COURT:**  Okay, thank you.

8      **MR. FARRELL:**  Especially in the face of a -- where we

9  in essence protected ourselves against that possibility by

10  requiring a representation by the borrower that they're not

11  going to use it for a purpose that goes beyond educational

12  benefit.

13     **THE COURT:**  Okay.

14     **MR. FARRELL:**  In other words, we basically said if

15  you take this money, you don't use it for what you're supposed

16  to do, you know, all bets are off, you have to immediately give

17  it back.

18     **THE COURT:**  But -- and I'm not sure we want to go

19  down this path today.  But these folks all know that the loans

20  are extending to these folks is that they are being used to pay

21  rent and to buy food and to do all those other things.  So, I

22  mean, I don't think that you -- I mean, it would seem odd to me

23  that you could contract away something that you already know.

24     **MR. FARRELL:**  No, I --

25     **THE COURT:**  I mean, I --

1     **MR. FARRELL:** -- you may have misunderstood what I

2 was saying, your Honor.  To the extent it is the person is in

3 school and they're using it for some of these ancillary things,

4 --

5          **THE COURT:**  Sure.

6          **MR. FARRELL:** -- that's part of cost of attendance.

7 My point was if they, you know, take it and quit school or

8 that, you know, the day they get the proceeds, they don't --

9 you know, they cancel their enrollment --

10          **THE COURT:**  I misunderstood.  I thought you --

11          **MR. FARRELL:** -- and they run off to Belize, --

12          **THE COURT:** -- were saying if there wasn't a

13 provision, then this is how it goes.

14          **MR. FARRELL:**  Yes, your Honor.

15          **THE COURT:**  Okay, all right, got it.

16          **MR. FARRELL:**  And then just to sort of create the --

17 or complete the factual record, then we have in each case,

18 Mr. Haas and Mr. Shahbazi, we have their bankruptcy schedules

19 which lists these as educational student loans.  And then in

20 each case, we have an interrogatory answer and a request for

21 admission where they basically concede that these were

22 educational loans taken for educational purposes and used for

23 those purposes.  We think with that factual record, there is no

24 additional discovery that's necessary.  We have basically the -

25 - all the facts necessary are essentially undisputed in the

1   record, and it does then come down to a pure interpretation of

2   the statute.

3        **THE COURT:**  All right, so the fact that the schedules

4   say it's an educational loan, you think that in and of itself

5   is sufficient for purposes of summary judgment.

6        **MR. FARRELL:**  I'm not sure it's in and of itself, but

7   when you add it with the terms of the promissory note and it is

8   part of the -- it's just confirmatory when you add it to the

9   promissory note terms and to the admissions response and the

10  interrogatory responses.

11       **THE COURT:**  Okay, all right.

12       **MR. FARRELL:**  Your Honor, the rest of what I would

13  say in terms of the -- you know, how the various courts have

14  gone off on the statutory interpretation, you know, that really

15  is two starkly different approaches.  They're both out there.

16  There's not a whole lot of mystery about which way the courts

17  went.  And we just happen to think that the ones that went our

18  way are correct --

19       **THE COURT:**  I got it.

20       **MR. FARRELL:**  -- when you start from the premise of

21  how clear we think the statute is itself.

22       **THE COURT:**  So you think I read the words and I need

23  to go no further than the words themselves.

24       **MR. FARRELL:**  I think that's right.  And I do want to

25  address one other point though that the other side raises in

1    their response, and that is that Navient has internal policies

2    and some investor materials that they say are inconsistent with

3    our current interpretation of the statute.

4              THE COURT:  Yeah, I get that argument.  It doesn't

5    matter if they're wrong too is where you came out.

6              MR. FARRELL:  Yeah.

7              THE COURT:  It may be an issue for later if it lives

8    that long.  But for purposes of determining what it is, doesn't

9    really matter what they think, doesn't really matter what the

10   individuals think, right?

11             MR. FARRELL:  Well, and --

12             THE COURT:  It either is or it isn't.

13             MR. FARRELL:  That's our position.  It's --

14             THE COURT:  Yeah, I got it.

15             MR. FARRELL:  -- the law is the law and it's for a

16   court to tell us what it means.  And I've got -- you know, if

17   we get this far, I've got an explanation for the policies and

18   procedures.  But I don't think it matters for the purposes of

19   this motion the way we've asserted it.

20             THE COURT:  Yeah, I -- actually I agree with you.  I

21   got it.  It's -- the words are either plain on their face or I

22   have to go look at other things to determine what the words

23   mean.  But what someone else thinks it means is irrelevant to

24   what we're doing today.  I totally concur.

25             MR. FARRELL:  So with that, your Honor, you know,

1  without beating a dead horse, I mean, it really is pretty

2  simple from our standpoint.  The words are clear.  Their --

3  under their interpretation, an educational -- excuse me, an

4  obligation to repay funds is not broad enough to encompass a

5  loan.  We just think that makes no sense.  We think the courts

6  that have gone the other direction have simply gotten it wrong.

7  The -- this canon of construction that says, you know, you've

8  got to interpret words by the company they keep, --

9          **THE COURT:**  Right.

10         **MR. FARRELL:**  -- the Supreme Court has said, yeah,

11 that can in certain circumstances be an appropriate canon of

12 construction.  But what you can't do is take, you know, two or

13 three words out of the middle of a statute and apply it.

14 You've got to apply that doctrine to the extent you even get

15 there, which we don't think you do, but to the extent you can

16 get there based on the entire statute.

17         **THE COURT:**  Yeah, I get that.  I think Justice

18 Scalia, who was a big user of a lot of those, I think he also

19 said that not everyone applies every time.

20         **MR. FARRELL:**  Right.

21         **THE COURT:**  And you use those things that help you

22 get to a sensical result.  I totally agree.

23         **MR. FARRELL:**  And, again, I've already made the point

24 that we don't think being superfluous, superfluity, matters

25 here, and it's not entirely -- it doesn't render the other

1  sections superfluous so --

2        **THE COURT:**  I got it.  All right, thank you.

3        **MR. FARRELL:**  Thank you, your Honor.

4        **THE COURT:**  All right, response?

5        **MR. BURGE:**  Thank you very much, your Honor.  I'll

6  skip over -- I was going to talk a little bit about sort of how

7  we got here today.  The one thing I will say about this

8  question of whether the policies apply, I'll just hit this

9  quickly, is we did take a 30(b)(6) deposition of Navient in

10  this case.  And they recognize that under their policies,

11  Michael Shahbazi's loan, one of the class reps, would have been

12  discharged but for a data processing error.  So their own

13  internal policies I would say agree with our interpretation of

14  the statute.  There are just mistakes that affect some

15  significant portion of this class that have led to them

16  collecting from a lot of people who, but for those mistakes,

17  they wouldn't be collecting from.  And their response to that

18  is, you know, to take this litigation position and refuse to

19  correct those data processing errors.  It's really shocking to

20  us.

21        **THE COURT:**  Right.

22        **MR. BURGE:**  We're here then the two issues, I'm just

23  going to cover jurisdiction very briefly because I think your

24  Honor is in agreement with me on this, just to create a record.

25  We think this is resolved by the *National Gypsum* case, *Cano*,

1    *Lonnie Davis,* and *Jones*.   *National Gypsum* recognizes that the

2    524 injunction creates a substantive right.   It can be asserted

3    through a declaratory judgment action.   *Cano* and *Jones*, the

4    recent decision of Judge Bohm, recognize that you have

5    jurisdiction under that -- over that under 1334 arising-under

6    jurisdiction.   The *Waffenschmidt* case is interesting for case

7    specific injunctions, but I think Judge Isgur correctly

8    analyzed it in the *Lonnie Davis* case where he said we're not

9    talking about a case-specific injunction here, we're talking

10   about a statutory injunction, and the kind of concerns you

11   would have if you had done a case specific injunction as in

12   *Waffenschmidt* simply don't apply when you're considering a

13   statutory injunction.

14          And I do think your point, which I take and I will

15   make sure we are careful about the distinction in the future

16   between the order signed by the judge and the injunction

17   created by the statute, I think is exactly right.   The fact

18   that a judge in Virginia signed the order of discharge rather

19   than a judge in Houston doesn't really matter because the

20   injunction's exactly the same.

21          And for Shahbazi's case, he lives here in Houston.

22   You have personal jurisdiction over him.   He ought to be able

23   to bring that declaratory judgment action in the place where he

24   is.   And finally, I guess just as a little side note on that,

25   you know, we're bringing a nationwide class action here hoping

1 to represent people throughout the entire country.  It makes

2 sense to us that we would want class reps from across the

3 country.

4          So turning to a statutory interpretation question

5 which I think is the -- really the main legal issue on the

6 merits of this case, I suppose to keep the record, I'll go

7 through the entire statutory interpretation argument, because

8 there's a lot of ones here and I think somebody -- each person

9 on my team has their own favorite, but I'll see how many I can

10 cover.  I think we should start with the whole statute.  I

11 think, you know, Tom made the point you have to look at the

12 entire statute, so let's do that.  If you look at 523(a)(8),

13 there are three distinct provisions.  It's pretty carefully

14 crafted.  You have the first provision which covers loans that

15 are funded by a nonprofit or guaranteed by the government.  You

16 have the second provision that covers obligations to repay

17 funds received as a benefit, scholarship, or stipend.  And you

18 have a third provision which covers qualified education loans.

19 And I think it's interesting you had a whole back and forth

20 with him about cost of attendance and what's in the cost of

21 attendance and what's not in the cost of attendance.  There's

22 extensive regulations that govern how we calculate the cost of

23 attendance and what's included.  And the argument Navient's

24 making here, that the second section of this statute covers all

25 private loans if they have any educational purpose whatsoever,

1   swallows that entire statute.  Why have all those regulations

2   about qualified education loans if all of it's covered by two

3   anyway?

4           I think if we drill down to the specific section that

5   Navient wants to talk to, the obligation to repay funds

6   received as an educational benefit, scholarship, or stipend,

7   and we look at that word "benefit," "benefit" has two possible

8   meanings.  It can be -- it's not defined in the statute.  And

9   if you go to the dictionary, it can mean an advantage or profit

10  gained from something, or it can mean a payment by an employer,

11  insurance company, or statute.  I think either of the two

12  possible meanings could fit there; although for reasons I'll

13  explain in a second, the second I think is clearly the right

14  one.  But because it has those two meanings, it is ambiguous.

15  You have to decide which of those meanings Congress intended.

16  They didn't intend both.

17          I think you start with the canon that words in a list

18  should be defined together.  This is explained in the *Essangui*

19  opinion.  You've got benefits, scholarship, and stipend.

20  Scholarship and stipend are both conditional payments that you

21  might have to repay if you don't meet the condition.  It makes

22  sense that benefit, one of the definitions of "benefit," a

23  payment by an employer, is a similarly conditional obligation.

24  It fits with the list, so that canon of -- there's two

25  different ways to pronounce that.  I'll call it *noscitur a*

1   *sociis*.  That is -- I think plainly applies there.  You have

2   the canon against superfluidity.  You've got two possible

3   definitions here, one of them swallows the entire section.  The

4   other one makes the second section distinct from the other two.

5   I think that's sensible.  I think one important thing to look

6   at here is look at the grammar of that clause.  It's "funds

7   received as an educational benefit," --

8           **THE COURT:**  As opposed to for.

9           **MR. BURGE:**  -- not for.

10          **THE COURT:**  Yeah, I got that.

11          **MR. BURGE:**  And I think if you listen carefully to

12  Tom, he said about ten times they used these funds for an

13  educational purpose.  He can't even bring himself to say they

14  used these funds as an educational purpose --

15          **THE COURT:**  Yeah.

16          **MR. BURGE:**  -- because it doesn't make sense, you

17  don't talk that way.

18          **THE COURT:**  Let's not pick on Mr. Farrell.

19          **MR. BURGE:**  I'm not trying to.  He's doing the best -

20  - you know.  So, and then finally, I think if you look at the

21  statute, you'll see that the word "loan" is specifically used

22  in the first section and the third section.  You know, Congress

23  knew how to use the word "loan."  They didn't use "loan" in the

24  second section.  I think it boggles the mind to think that the

25  one section they didn't include "loan" in is the one that

1  actually includes every possible loan, not the two sections

2  that define specific types of loans that are exempt.

3        **THE COURT:**  But don't you agree that "obligation" is

4  actually broader than "loan?"

5        **MR. BURGE:**  Oh, I would agree with that.

6        **THE COURT:**  Okay.

7        **MR. BURGE:**  And I think that was intentional.  The --

8  Congress meant to cover any kind of employment benefit, you

9  know, scholarship, or stipend that somebody might have to repay

10  as a conditional grant.  They didn't want to have any confusion

11  about if you're getting a scholarship and you have to repay it,

12  it's covered.  So obligation to repay funds, make sure we're

13  being really broad.  But then they immediately limited it

14  "received as" an educational benefit, scholarship, or stipend.

15        **THE COURT:**  Okay.

16        **MR. BURGE:**  I think if you look at the legislative

17  history -- one thing I think is kind of interesting here, we

18  obviously have a legislative history that we pointed to you.

19  Tom responds that that was a U. S. Attorney, not a member of

20  Congress.  But what I took from their legislative history, we

21  think some of it they take out of context.  But the main point

22  they make is just the general statement that over time,

23  Congress has always expanded the exception to dischargeability.

24  And I think that is true as far as it goes.  But if you look at

25  the specific 2005 amendments, they added all of this language

1   about qualified educational loans in that third section.  That

2   was the big increase in the exemption of dischargeability added

3   in 2005.  And I think you would surprise everybody in Congress

4   to learn that adding qualified educational loans was irrelevant

5   because all of those qualified educational loans were already

6   exempt from non-dischargeability in the second section.  I

7   think that third section which they added in 2005, they thought

8   they were doing -- you know, greatly expanding the private

9   student loans that were covered, they didn't think that what

10  they were adding there in that third section was irrelevant, it

11  was already covered by the second section.

12          Now, we talked a little bit about counting cases.

13  You know, I think we have the majority, 19 to 17.  I don't

14  think it really matters because the truth is, the recent cases,

15  the ones in which all of these arguments have aired, I think as

16  we explained in our brief have largely gone in favor of us.

17  And I think if you take a look at the cases they cite, the

18  older cases, I think *Shaw* is a fine example.  To the extent the

19  courts address these issues, they really do it as dicta.  *Shaw*

20  was a case here in the Southern District of Texas that was

21  largely about undue hardship and whether a loan taken out

22  before 2005 should be interpreted under this version or the

23  prior version of the statute.  The -- everybody in *Shaw*

24  acknowledged that the loan was covered by all three of these

25  sections of 523(a)(8).  It was funded by a nonprofit, it was a

1  qualified education loan.  So the fact that the court also

2  found that it was an educational benefit, I suspect that

3  argument wasn't even briefed.  It's definitely dicta.  There's

4  no analysis there whatsoever.  The idea that that is a

5  considered, you know, ruling on this issue I think is just

6  wrong.

7          We actually have a more recent case that wasn't even

8  -- you know, it was decided since we submitted the briefs on

9  this, the *Wiley* decision that I have a copy of for Tom and one

10 for the Court.  It's *In Re Wiley*, 579 B.R. 1 from the District

11 Court of Maine.  Hand you a copy of that.

12         **THE COURT:**  Thank you.

13         **MR. BURGE:**  It analyzes a lot of these same issues

14 and rules in our favor as well.  And, you know, these decisions

15 keep coming out.  I think it -- I agree with you, your Honor,

16 it'd be helpful to have some direction from some higher courts.

17 The highest court that's put out a published opinion on this is

18 the Ninth Circuit Bankruptcy Appellate Panel in *Kashikar* which

19 we agree with that, but that's, you know, one bankruptcy

20 appellate panel of the Ninth Circuit.  It would be helpful to

21 have some more direction on this.

22         **THE COURT:**  Agreed.

23         **MR. BURGE:**  One other kind of minor point.  There's

24 an argument made by Navient that the way you can understand

25 this -- you know, this second section doesn't swallow the whole

1    statute is that with the second section, you have to actually

2    receive the funds.  And that's not the way the first and the

3    third section works.  That's not actually the way Navient

4    interprets the statute; because if that was the way you

5    interpreted the statute, the cosigners would be able to get out

6    of these loans in bankruptcy because the cosigners never

7    receive the funds.  But that's not the way that Navient has

8    interpreted the statute.  They say nobody gets out in

9    bankruptcy.

10            Finally, on the factual issue, just to preserve the

11   record, we've submitted that investor presentation where I

12   think Navient represents to investors that most of their

13   private student loans are not dischargeable in bankruptcy, but

14   the career training loans here are dischargeable in bankruptcy.

15   That's in the record at Document 100-9.  Exhibit 3 to our

16   motion is Navient's internal policies which make clear that

17   when they're deciding whether a loan is subject to bankruptcy,

18   the policies they've developed are do they get a 1098, is it a

19   qualified education loan; if not, is it a non-Title Four

20   school?  If it's a non-Title Four school, it should be

21   considered discharged and the loan should be written off.

22   That's completely consistent with our interpretation of the

23   statute that we're arguing right here.

24            Finally, on that question about the promissory notes

25   and the fact that there's a reference to the educational

1   purpose in the promissory notes, that is relevant when you're

2   talking about a loan that is guaranteed by the government or

3   funded by a nonprofit, because obviously the Federal government

4   issues all kinds of loans and you have to have some way of

5   determining whether a Federal government loan is covered in

6   523(a)(8) or not.  And for that you look at the educational

7   purpose.  That doesn't speak to this educational benefit

8   question particularly under our definition of "benefit."  And

9   with that, I think -- we think this motion for summary judgment

10  should be denied.

11          **THE COURT:**  All right, thank you.

12          **MR. BURGE:**  Thank you, your Honor.

13          **THE COURT:**  Mr. Farrell, I will give you last word.

14          **MR. FARRELL:**  Your Honor, I'm going to leave it

15  pretty much where it is.  The Court has the cases, the Court

16  can read the cases better than we can.  And so you -- the

17  argument's out there.  I just can't help but note one thing,

18  though.  At one point the argument is that our interpretation

19  is so outlandish it "boggles the mind."  On the other hand,

20  there's a concession on the other side that the statute is

21  hopelessly ambiguous and that in order for it to be ambiguous,

22  as they say in their brief, there's got to be two reasonable

23  interpretations.  So you can't have it both ways.

24          **THE COURT:**  I got it.

25          **MR. FARRELL:**  And, you know, the main argument is, as

1   the Court indicated, an obligation to repay is broader than and

2   includes by definition and common, everyday parlance a loan.

3          **THE COURT:**  All right.

4          **MR. FARRELL:**  Thank you, your Honor.

5          **THE COURT:**  Thank you.  Folks, I am -- I will issue

6   something in writing on this, again given the statements that

7   you're going to seek or you're going to seek immediate review

8   of an adverse order.  What I will do is just to try to expedite

9   the process, in the written order I will make a recommendation

10  for a direct appeal to the circuit so that you don't get caught

11  up in the climb from the district court to the appellate court.

12  My inclination is to still deal with the stay issue the way I

13  described.  I don't know what the right amount of time is but I

14  will try to look at some prior direct appeals to figure out

15  what makes sense for everybody, and that way it'll be a balance

16  between trying to move everything forward and trying to not

17  just stop it.  But I do think under any circumstances, we're

18  not going to have -- I think the certification hearing is

19  probably off.  I think in part what we do with it will depend

20  upon how quickly I can get this done and how quickly we can get

21  someone's attention at the circuit.

22         **MR. FARRELL:**  Yeah.

23         **THE COURT:**  Does that all make sense?

24         **MR. FARRELL:**  It does, your Honor.  Under the current

25  scheduling order, there's actually not a hearing date for the

1   certification.  There's a date by which the last briefs have to

2   be done.  And then I think we were going to have a status

3   conference and actually set a hearing.

4           **THE COURT:**  Oh, that's right.  I totally -- I

5   interlineated that in, didn't I?  Or I did something.  Anyway,

6   so --

7           **MR. FARRELL:**  So right now the -- I think the last

8   brief is due May something.

9           **THE COURT:**  My sense --

10          **MR. BURGE:**  The last brief's due May 5th.

11          **THE COURT:**  My sense of it is, is that we ought to go

12  ahead and finish that.  But if you all feel differently, I'm

13  happy to hear it.  I just don't think we can start the hearing

14  until the issue is resolved.

15          **MR. FARRELL:**  Yeah, from our perspective, your Honor,

16  part of the reason of doing this was to try and obviously get

17  final resolution or as close to final --

18          **THE COURT:**  No, sure.

19          **MR. FARRELL:**  -- resolution of the statutory

20  interpretation as we can and, frankly, to cut off the expense

21  and the --

22          **THE COURT:**  But what's left to be done, other than

23  the briefing?

24          **MR. FARRELL:**  Well, so we've got the --

25          **THE COURT:**  Because you're billing, what, like 150,

1    175 an hour now?

2           **MR. FARRELL:**  Little bit more than that but --

3           **THE COURT:**  Yeah.

4           **MR. FARRELL:**  -- in that range.  There's a difference

5    between what I bill and what they pay so --

6           **THE COURT:**  Oh, fair.

7           **MR. FARRELL:**  We have expert reports on our side due

8    in a couple of weeks, and then we have briefing and we have --

9    they've -- I think you've taken all the depositions you want at

10   this point, but we still have the four class reps to depose.

11   So there's a fair amount of additional activity --

12          **THE COURT:**  And so what are you proposing?  Are you

13   proposing that it -- we stay it immediately, or do you want to

14   take those four depos and then stay it?  What are you

15   contemplating?

16          **MR. FARRELL:**  My preference, your Honor, would be to

17   -- and, again, I -- it does sort of depend on when you think

18   you're going to get an opinion out.  And that was not a --

19          **THE COURT:**  No, no, I got it.

20          **MR. FARRELL:**  -- I'm not trying to -- I'm not fishing

21   for anything, I'm just saying.  But my preference would be to

22   kind of put everything on hold until you get an opinion out,

23   and then you decide in there what additional time period of a

24   stay you have in mind, and then we go from there.

25          **THE COURT:**  Let me -- can I -- I get the argument,

1 with the exception of taking the four class reps.  Why wouldn't

2 you want that memorialized?

3          **MR. FARRELL:**  Well, I'm actually happy to do that.

4 It -- that's not a big deal.  We do have -- you know, we've

5 got --

6          **THE COURT:**  Are they scheduled?

7          **MR. FARRELL:**  No.  We've asked for dates and we're

8 working on coordinating dates.

9          **MR. BURGE:**  I suspect they'll all be set within the

10 last two weeks of March.

11          **THE COURT:**  My thought, unless anyone wants to argue

12 strongly against it, my thought is you take the four class reps

13 so that we get that memorialized.  And then I'm assuming at

14 that point you can brief from everything that you've gotten

15 done once we start that back up.  Is that a fair assumption?

16          **MR. BURGE:**  I mean, I think that, you know, obviously

17 we're -- we've been working on the briefs and we're in a

18 position to be able to brief this so I think --

19          **THE COURT:**  Sure.

20          **MR. BURGE:**  -- we'd be perfectly happy to move

21 forward with briefing now and have all that done so that

22 whenever we come back down, we submit it.  But it may be that

23 there's something in your order or in the Fifth Circuit's order

24 that's helpful in terms of the briefing so --

25          **THE COURT:**  Right, so --

```
 1          MR. BURGE:  -- I mean it could make sense.

 2          THE COURT:  I think --

 3          MR. BURGE:  Rather than have to do a whole nother set

 4   of briefs that respond to whatever has happened.

 5          THE COURT:  I'm going to get your note.

 6          MR. BURGE:  And there are a few outstanding issues

 7   that we've been going back and forth on just in terms of

 8   discovery.  They sent a letter to us asking for some things.

 9   We've sent some letters to them.  So we may be able to resolve

10   that now kind of in keeping with the class members'

11   depositions.

12          THE COURT:  And can you just -- and I don't want to

13   get into the argument, but what are we talking about?

14          MR. BURGE:  Sure, there's some privileged documents

15   that we want them to produce.  They either argue they have

16   produced them or that they're properly privileged.  So we might

17   fight about that.  And then there could be some discovery into

18   -- and those privileges have to do with sort of how their

19   policies are created.

20          THE COURT:  What I would like you all to do is see if

21   you can't craft an agreed-order that, one, will have the four

22   class rep depos proceed.  If there are discreet issues that you

23   want to have resolved, i.e., we can't get a privilege list that

24   reflects the date of the correspondence or, you know, something

25   like that, carve those out and then stay everything else
```

1    pending further order.  Do you think you all can craft through

2    that?

3             **MR. FARRELL:**  I think so.  I don't want to lay behind

4    the log on an issue, though, because the -- our expert reports

5    are still out there, too, and we would prefer to put those in

6    the --

7             **THE COURT:**  Well, no, --

8             **MR. FARRELL:**  -- hold category.

9             **THE COURT:**  -- that -- to me, that would just get

10   stayed.

11            **MR. FARRELL:**  Yeah.

12            **THE COURT:**  But if there are some things that are

13   sort of midstream, i.e., you know, you gave me page one and

14   three of a document and we're fighting over page two then, you

15   know, let's tee that up and get that done.

16            **MR. BURGE:**  Yeah, agreed.

17            **MR. FARRELL:**  I doubt very seriously we're going to

18   be back before you on any of those kind of issues, --

19            **THE COURT:**  All right.

20            **MR. FARRELL:**  -- but I'm happy to carve them out if

21   we need to.

22            **THE COURT:**  Sure.  And but if you could do that.  If

23   you cannot reach a consensus on what that order ought to say --

24   and all I'm asking you to do, you're waiving those substantive

25   objections, you're simply implementing my instruction.  If you

1  cannot get that resolved, then call Mr. Alonzo.  I don't need a

2  motion, just call Mr. Alonzo and I'll set an emergency hearing.

3  You can each bring your form of order.  Hopefully by then I

4  will have moved this along.  I hope -- I just -- you know, I

5  got behind last summer when I went back to Duke and finished

6  up.  And I've gotten everything down to where I'm two behind.

7  I'm working on one.  I'm going to stop that and do this, so

8  hopefully I can get this done reasonably quickly and we'll --

9  I'll do my best.

10            **MR. FARRELL:**  Great.

11            **THE COURT:**  All right?

12            **MR. BURGE:**  Absolutely.

13            **THE COURT:**  Anything else this afternoon?

14            **MR. FARRELL:**  Nothing further from the Defendants.

15            **THE COURT:**  Really appreciate the argument, thank you

16  all.

17            **MR. BURGE:**  (Indisc.) the Plaintiffs.  Thank you,

18  your Honor.

19            **MR. FARRELL:**  Thank you, your Honor.

20            **THE COURT:**  Thank you.

21      **(This proceeding was adjourned at 4:20 p.m.)**

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    __March 8, 2018__

         Signed                                                        Dated

*TONI HUDSON, TRANSCRIBER*